

**SIGNED this 22nd day of May, 2012.**

_____
**LEIF M. CLARK
UNITED STATES BANKRUPTCY JUDGE**
_____

# United States Bankruptcy Court
Western District of Texas
San Antonio Division

| | |
|---|---|
| In re | Bankr. Case No. |
| Kamayan Holdings, LLC | 10-54702-C |
| *Debtor* | Chapter 11 |

## Decision on Plan Confirmation

This is a decision on confirmation of the debtor's plan of reorganization. The debtor is the owner of a hotel in Kerrville, Texas. PMC is the debtor's secured creditor, and objects to the plan. There is no dispute that the debtor has satisfied all the elements of section 1129(a), save for two. With respect to feasibility and cramdown, PMC says that the plan fails and should not be confirmed.

PMC presented evidence at the hearing to the effect that the debtor would have to have a residual value equal to or greater than $2.357 million in order to have a feasible plan. The plan proposes to pay PMC interest only for a period of five years (with some of the interest deferred), and to pay the balance due at the end of that term.

The plan also proposes to pay the SBA, a second lien creditor, over $462,000 at the end of the plan term, with interest only payments at a graduated rate. Ad valorem secured tax claims are to be paid in accordance with the requirements of section 1129(a)(9), with interest at the statutory rate. Priority tax claims are to be paid in monthly payments. Unsecured claims are proposed to be paid 20% of their claims, out of net operating income (though creditors can elect a 5% lump sum payout instead). Equity obtains nothing under the plan, though holders can obtain a new interest as part of a post-confirmation capital rise.

PMC does not dispute that its claim is oversecured, though it declined to stipulate as to value. However, the testimony supported a range of values between $1.7 and 1.8 million (the property was valued in 2010 at $1.85 million).

The debtor presented credible evidence that its operations have been above average for the area -- in fact it has outperformed the Kerrville hotel market by 35% over a four year period (though it suffered a dip in 2010). The operator is skilled, careful, and honest. Substantial improvements have been made to the property, including the integration of the neighboring restaurant and bar, and resurfacing the pool deck. The hotel market in general is not strong, but this operator is doing well, even without a "flag" or franchise. No one can offer trustworthy prognostications of the future for the overall economy (or even the future economy of Kerrville), but the debtor's track record in a difficult market is itself strong evidence that the debtor is capable of outperforming the local market going forward. Its cost structure is reasonable. While its failure to set aside a maintenance reserve is troubling, it proposes to raise additional capital for that purpose from old equity, which has made contributions in the past for improvements.

The lender challenged some aspects of the debtor's feasibility, primarily by means of cross examination of the debtor's principal, but also by presentation of an expert witness who offered some financial modeling drawn from the debtor's disclosure statement. Questions were raised about the extent to which the debtor could expect to continue its growth rate. The debtor maintained that it could continue to outperform the local market, while the expert seriously doubted the debtor could maintain a growth rate of 10% per year. The obligation of the court is determine whether the plan is *viable* and that the debtor has the ability to meet it future obligations as provided in the plan and as may be incurred in operations. *See* ALAN N. RESNICK & HENRY J. SOMMER, 7 COLLIER ON BANKRUPTCY, 16TH ED. ¶ 1129.02[11] (LexisNexis 2012). The debtor's performance thus far has been sufficient to maintain interest payments to the lender. The debtor will have to maintain a rate of growth of at least 6% in net operating income in order to keep up with plan obligations.

Because the plan backloads so much of the indebtedness, the real question with regard to feasibility turns on terminal value. Is there sufficient value at the end of the projected five year period to satisfy the outstanding claims of creditors? The lender says that the terminal value of the property is such that the debtor will be unable to sell or refinance the property. The debtor insists that there will be more than enough value.

To resolve the question, one first must define the term. Terminal value (or horizon value) is the present value at a future point in time of all future cash flows, assuming an expectation of stable growth beyond the end of the projection period. It is often used when projections of cash flow are limited to a several year period (in this case, five years). Forecasting beyond that point in time is impractical, if not impossible, given that

it no one can truly predict macroeconomic trends that far into the future. This can be done in a couple of different ways. One is the "perpetuity growth model" which assumes growth at a constant rate. The other is the "exit multiple model" which assumes that a business will be sold at the end of the projection period.[1]

Here is how the perpetuity growth model works. First, one projects the free cash flows to be generated in the first year beyond the projection horizon (here, that would be a projection of cash flows in year six). Second, one divides that number by a rate, consisting of the discount rate that had been used in discounting the cash flows over the first five years (in this case, 300 basis points over Wall Street Prime rate of 3.25%, as of May 22, 2012), minus the assumed perpetuity growth rate (often assumed to be in the range of 2%).[2] This yields the present value of those future cash flows, as of the end of the fifth year (the beginning of the perpetuity term).

The exit multiple approach applies an accepted multiple to cash flow as of the end of the projected period. A common multiple used is enterprise value, divided by EBITDA. Enterprise value is the sum of the market value of debt and equity of a business, the presumed price one would have to pay to acquire the company.[3] When the company is in bankruptcy, equity often disappears from that calculation, because of the absolute priority rule. So also might unsecured debt, where the value of secured

---

[1] This general description is taken from an entry on Wikipedia, at http://en.wikipedia.org/wiki/Terminal_value_(finance)(visited on May 21, 2012). It was selected not for its authoritativeness, but for its clarity. An authoritative text which confirm the accuracy of this description (though with considerably less clarity) is P. Pantaleo & B. Ridings, *Reorganization Value*, 51 BUS. LAW. 419 (1996). *See also In re Nelson Nutraceuticals, Inc.*, 356 B.R. 364, 367 (Bankr. D.Del. 2006); *In re Mirant Corp.*, 334 B.R. 800, 842-43 (Bankr. N.D.Tex. 2005); *In re Bush Industries, Inc.*, 315 B.R. 292, 299-302 (Bankr. W.D.N.Y. 2004).

[2] *See In re Mirant*, *supra* at note 1. The discount rate analysis follows the path laid out in *Till*. *See Till v. SCS Credit Corp.*, 541 U.S. 465 (2004); *see also In re Walkabout Creek Ltd. Div. Housing Ass'n P'shp*, 460 B.R. 567, 574 (Bankr. D.D.C. 2011) (applying *Till* in a chapter 11 context).

[3] *See* http://en.wikipedia.org/wiki/Enterprise value (last viewed May 22, 2012).

claims is capped by the value of the property of the company. Thus, in our case, the enterprise value of the company is likely to be little more than the current value of the hotel itself, in a liquidation.

There are problems with both approaches. Still, it is never a good thing to let the perfect be the enemy of the good. The court in this case must use some accepted method for evaluating terminal value, in order to confirm whether the debtor's plan can be confirmed. The case law commends one of these two approaches.

The court has applied both methodologies to the projections in this case. At the outset, the court agrees with the lender that a 10% per annum growth rate is likely not sustainable. However, the court also agrees with the debtor that it is capable of a better growth rate than other hotels in the area. History confirms this, as does the observation that the debtor is highly motivated to perform. The debtor has made significant investment in the hotel, which will be lost if the hotel is lost. With these thoughts in mind, the court has adopted a 6% growth projection.[4]

In applying the perpetuity growth model, the court took revenues anticipated in year 6 (presumed to grow at the same rate as in the projection), $194,300, and divided it by the presumed discount rate in this case, 6.25%, less a presumed growth rate of 2%, or a divisor of 4.25%. This yielded a terminal value of $4.172 million.[5]

---

[4] That projection is one of a number of alternatives analyzed in the lender's expert's modeling. PMC Exhibit 16. There are problems with this model, including the fact that it presumes a uniform growth of fixed costs to match the growth in revenues. Of course, that is not a correct assumption, as such costs are, by definition, *fixed*. They grow with inflation, not with revenues. Still, for ease of use, the court has ignored this flaw, as it yields a more conservative ending number.

[5] As a check, the court also used the lender's proposed rate of 9%, similarly discounted. That calculation yielded a perpetuity growth model terminal value of $2.775 million.

In applying the exit multiple model, the court first derived a multiple, yielded by dividing enterprise value by current EBITDA. The most current EBITDA number available is that for 2011 -- $$134,931. As for enterprise value, all parties agree that the first lien lender is oversecured, but that, as of today, the second lien lender is probably underwater. While no one wanted to commit to a valuation for the property, the parties generally agreed that a value in the range of $1.7 to 1.8 million was likely to be realistic. As the court, in arriving at enterprise value, is valuing the *debt*, rather than the asset that secures the debt, the court need only consider what a third party would likely have to pay the SBA to take out its position.

The SBA is a frequent creditor in bankruptcy cases. They typically find themselves in out of the money situations. As such they are often prepared to accept less than full payout. By the same token, however, a second lien position has some hold up value, such that the SBA could negotiate for a higher payment than it might expect in a straight liquidation, when it is approached by an investor interested in buying the company in place. The court reasonably estimates that the SBA would accept $200,000 for its claim. Adding this number to the secured claim of the lender (and rounding up for ease of reference) of $1.65 million yields an enterprise value of $1.85 million, as other creditors (and equity) are out of the money at this point.

Dividing enterprise value of $1.85 million by EBITDA of $134,931 yields a multiple of 13.7. This multiple is then applied to EBITDA as of the end of the last year of the projection period, $183.302. This generates a value of $2.513 million.

The court elects to adopt this value as the terminal value of the cash flows to be generated after the projection period, discounted to present value as of the end of the projection period.

The lender's expert took a different approach. He took the presumed cash flows at the end of the last year of projections, and divided it by a capitalization rate of 9% that he maintained represented an investor's expected rate of return. He emphasized that he was not in fact purporting to value the company, as that task exceeded his mandate, but maintained that his approach yielded a proper termination value. The court's research has failed to uncover a rationale for using this approach over the accepted methods that are outlined here.[6] It is therefore rejected.

The plan easily meets the cramdown test. It proposes to pay PMC a rate of interest that exceeds the discount rate of 6.25% this court finds to be appropriate for cramdown. In addition, the terminal value at the end of the period exceeds the amount of the creditor's claim. Thus, the standards for cramdown under section 1129(b)(2)(A)(i) are met.

The terminal values indicated by the methodologies here employed support the conclusion that the debtor's plan is feasible. The lender's objections to confirmation are overruled and the plan is confirmed. The debtor is requested to submit a separate order of confirmation.

# # #

---

[6] That is, accepted in the case law. *See, e.g., In re Bush Industries, Inc.*, *supra* at note 1. What is more, the expert did not offer any testimony of having tested this capitalization rate in the market, or of having surveyed any comparable business sales. While the court found the witness both credible and helpful, the court cannot accept this number on simple "say so."